Good morning, guys. Johnson vs. Superintendent. Johnson vs. Attues. Good morning. Good morning. May it please the court, my name is Alice Wiseman from the Manhattan District Attorney's Office. I'm appearing on behalf of the Respondent Appellant in this matter. Your Honors, the district court here granted the habeas petition based on its conclusion that the Batson Stage 3 factual findings of the State courts were clearly erroneous. That was the incorrect standard to use in this habeas proceeding. Moreover, even by that standard, which is much less deferential than the actual standard that should have been applied, that ruling was an error. In this case, I think there's no dispute that the State courts, both the trial court and the appellate court, recognized and applied the correct controlling law here, which is the Batson procedure for determining a Batson challenge. The trial court found a prima facie case, asked for race-neutral reasons. The prosecutor gave what I think everyone concedes were race-neutral reasons. The trial court then invited the defense to explain why, in its view, these reasons were pretextual. It then listened to the defense's arguments, it listened to the prosecutor's arguments, and in each instance decided to allow the prosecutor's challenge. So what we're left with here, then, is the only way that a habeas corpus petition could be granted here, is if those stage three findings of the court, which are pretext findings, were unreasonable. I'm not trying to put words in your mouth, but that's my understanding. That is the word that was about to come from my mouth. Yes, Your Honor. And in making that determination, essentially what the district court did was to look at the cold record, which obviously is all that this court or the district court can have in front of it, and substitute its own opinion or judgment of the prosecutor's reasons for what the trial court found. That is very clearly not sufficient to grant a habeas corpus petition. The Supreme Court and this Court have held repeatedly that it's not enough that reasonable minds might differ. It's not enough that even that a contrary decision might be supported by the record. It's certainly not enough that the reviewing court, the habeas court, might have reached a different opinion in the first instance itself. So let me, Ms. Wiseman, let me focus you on, and I think I've got the names of these prospective jurors correct, but sort of Ms. Williams compared to Mr. Wong. Okay. Ms. Williams, as I think the record shows, was, she was rejected by the, the reason given for her rejection was that she was young, a college student, and did not have much life experience. Correct, Your Honor. And I'm not, I don't see a real distinction with any difference between where those factors as they bear on her and as they bear on Mr. Wong. Well, I think, Your Honor, you have to look at the whole course of jury selection here. Ms. Williams was a juror who's been considered on the first day of jury selection. At the time that the prosecutor challenged her, in, in state court there are 20 preemptory challenges for cases of this nature. At the time the prosecutor challenged her, he'd used three of those challenges. And he explained, as you said, that he, he believed simply by virtue of her youth and the fact that she appeared to be a college student without any other life experience that, that was before the court, that he thought that in a case of this nature, you know, she was not a juror that he would want to sit. And I think that's certainly a valid, you know, there's nothing suspicious about that reasoning. I think he said she was a student, she was single, she was unmarried, and she was simply too young. I'm not sure that being a student, single, unmarried, and I don't know what simply too young means if the person was of the statutory age to serve. So that kind of looks to me a little odd. Well, Judge, the prosecutor amplified later that his view, I think he explained this is a case, and it indeed is a case, and I know the facts and the details of this case haven't been threshed out in the briefing before you. But this is not only a very serious case, but a case of kidnapping and murder that involves cooperating witnesses, the people had testifying who were themselves very bad people. It grew out of a drug-dealing milieu. It involved evaluating a statement made to a detective that was not recorded. So it's not a simple case. It's a case that requires, I think, a lot of common sense and mature experience. And I think it's certainly valid for any prosecutor to consider that. And he, as I say, he does amplify later that this is his concern about the case and that he doesn't think that she has enough real-world experience. And I think that is valid. I mean, the fact is— What was the concern with the person who was not young and single and a student but rather worked as a security person in a rehab center who had experience with people who, when they get out of jail, have mental problems, the prosecution said that they were concerned that that person might be in contact with people who had degrees of substance abuse problems who sort of knew too much about the prosecution's principal witness, who was a drug dealer. I mean, obviously, you're dealing in a situation where you've got drug couriers and drug dealers fighting it out, killing each other. It seems to me that, on the one hand, you've got the student who is too young and doesn't know enough. On the other hand, you've got someone who's familiar with the world and who knows too much, and they just both happen to be African American. Judge, I don't think there's any inconsistency there. I mean, one may very well find that a person who doesn't have enough general experience to evaluate any serious case that involves serious issues—and again, he's not making— and for both of these things, we have to realize that in the jury selection context, you don't have unlimited time or ability to question people. So you're going to have to use—you're going to have to look at things and make determinations in categories or using proxies. And that's fine as long as those proxies are not race. So to say, hey, if you're just a college student and you don't have any other countervailing life experience that I'm aware of, then I will not—do not want you on a jury like this, versus looking at somebody who is a security guard and who, although the district court found that, oh, there was no evidence that this person dealt with possible drug-addicted people, although everybody below seems to have believed and assumed it was true. The court did. The prosecutor did. The defense never challenged that. Well, I think the district court judge is in the business— I can speak from a little knowledge of picking juries. So I think you have a fairly sophisticated evaluator of how this was done here. I'm not—we can get into the question of the legal standard, which I think I'll defer to my colleagues on as to whether or not the legal standard was met here, but it is a little bit— Well, Your Honor, I'm sorry. I see my time is up, but if I could just— Please. Yes, please do. So with respect to Ms. Ritty, who is the security guard, I do want to point out that it's not just the prosecutor and the judge below who understood her references to working at a rehabilitation facility as involving drugs. It's also the defense never challenged that, and in fact never even challenged as pretextual this particular basis given for challenging this juror. And again, I think the prosecutor, as he specifically said, I don't know how her experience with people who might be drug addicts would affect her evaluation of the case, but that kind of experience, and it might also arise in a case where a person had family members who are addicts, for example, it could lead you in a lot of directions. It might make you say, well, I don't believe—I believe that drug addicts will say anything, or I hate drug dealers for doing this. So it's just too much of an uncertainty. That's what the prosecutor was saying in this case to put this person on. And I'm sorry, Your Honor, I didn't— Let me go back to Ms. Williams. I remember being trained as a prosecutor that, generally speaking, you didn't want young people on the jury because they're too idealistic and liberal, other things being equal, than older people with more experience. But I think the original question you were asking, I don't know that you got all the way through your answer, was that there were other comparably young people with similar life experiences or lack of life experiences who were not black that the prosecutor didn't challenge. Yes, Your Honor, thank you. I did not finish my answer. That's right around. So Williams is challenged with one of the first challenges that's used at a time when the prosecutor, you know, is looking at the jurors in front of him and is saying, you know, this is a person who I don't necessarily know anything to her particular disfavor, but she falls into a category that I don't want on this jury. The next day, at the very end of the next day, when they've had a lot of trouble getting a jury in this case, when they still have to select four jurors and three alternates and where they have come to the end of this jury veneer entirely. So if they don't have a jury here, they're going to have to come in the next morning with a whole new panel of people. Those people could be, I mean, we've all seen, we've all either tried cases or conducted trials, I'm sure, and we've seen that, you know, some veneers are good for the prosecution, some veneers are not. Some, you know, it's just the way, the luck of the draw. So at that point, when the prosecutor has five challenges remaining, if he uses two of them to strike these jurors, who, again, there's nothing specific about them personally that he says is bad, but they do fall into a category he doesn't want. And this is essentially what he says when asked about it. His strategy is different at that point, because he doesn't want to go into the next day with still potentially four jurors and three alternates to pick from a veneer that might be full of very bad jurors for the people. So he's going to make a different determination. He's going to be more careful about using the challenges. And that is reasonable strategy. Again, the heavy burden that has to be met to overcome the trial court's finding here, I don't think that. The trial judge in the state court who also has a lot of experience with jury selection and who is watching this proceeding transpire in front of him. Exactly, Your Honor. And not only watching the jurors, but watching and listening to the prosecutor and his ability, even on direct review, the ability of the trial judge there to assess the demeanor of the person who is explaining his challenge on that fundamental credibility issue does deserve enormous deference. You've reserved time for three minutes for rebuttal, Ms. Wiseman. Ms. Wiseman, excuse me. Mr. Holland. If it pleases the Court, I think that the interesting thing is that Ms. Wiseman makes clear that there are categories of people that were not wanted on this jury. And it's pretty clear from the way that the challenges were exercised that the only category of people he did not want were African Americans, and the prosecutor would go to any level to try to justify why he did that. Were there African Americans who wound up on the jury? My understanding is there were two ultimately that did, but the basis for their criteria of admission obviously wasn't the subject of discussion, but I think we can find it in the course of this, which is that under Jordan v. Lefebvre, there's four different criteria that are race-neutral bases to strike a juror, being age, negative experience with law enforcement, demeanor, or type of employment. Going through all these, Judge Hellerstein clearly gave close attention, and he is a very skilled jurist who found that ultimately the trial judge not only abdicated in certain places his responsibility that's imposed on him in Batson and Perkett v. Elm to go into and really explore the explanations given to see if there is sort of fictitious or pretextual reasons given for discrimination, but he found that it was patently false, some of the explanations given, that is far beyond the unreasonable threshold that he might have had to have found in order to be able to overturn the convictions. You see that particularly with the case of Ms. Caliste, who's the one who makes the hissing sound. At one point, you know, this is a woman who the prosecutor says that his challenge is justified on the basis that he heard a hissing sound. He thought that she was having either conversation, internal conversation, and she was suffering some sort of mental illnesses. What is the – Didn't the trial judge credit that explanation? Absolutely not. I thought he said if you understood it to be that, that's an okay reason. Well, in that sense, yes, Judge, but before they said no, she was trying to hand the microphone to another juror. No, no, I understand that there was a back and forth, but then wasn't the default position ultimately, and I just want to make sure I understand. No, no, that's absolutely correct, Judge, that he did find that it was true, that's what the prosecutor heard, but that's not one of the four race-neutral explanations. Wait, wait, wait, wait, wait, wait. When has the Supreme Court or this Court ever said that there are only four possible reasons to challenge a juror that are race-neutral? I thought the law was any reason that is not race is a valid reason. It doesn't have to make sense. It has to be a good-faith belief by the prosecutor. And you're correct, Judge, you're not limited to that. Those are the four general categories of race-neutral. What if you challenged a juror because he or she was wearing sunglasses indoors and you thought that showed a sort of anti-establishment belief? That doesn't make a lot of sense to me, but I was told, actually, as a young prosecutor, that that's something you should look for. Is that not proper? But that's not an immutable characteristic like the issue of race that these jurors all experienced together, which they had in commonality with the defendant. How about this category, Freda Bell, who's challenged because she struck the prosecutor as being perhaps mildly retarded, not able to follow a complicated case, and because her domestic partner was a convicted murderer? This is a murder case. I mean, do you think that that's not possibly race-neutral? No, and, Judge, let me explain why, because particularly, and I'm glad you brought up Ms. Bell, this is very close to what would be an excited utterance in a hearsay situation. The guy gives right off the bat, what is his gut reaction when asked, justify it. With Ms. Bell, he said, I thought she was mildly retarded, inarticulate, wouldn't be able to express her views well. It's when he's discussing the fourth challenge. Ms. Ritty says, oh, yeah, by the way, it was because she's married to a convicted felon, and that factored into the people. Murderer. I'm sorry, convicted murderer. I'm sorry, Judge. That's a valid reason. Had that reason been given, we wouldn't be here today. With the secondary, you know, back-filling explanations that the prosecutor reached for, realizing he's got to bring these back to race-neutral explanations, had he given those up front, we never would have been here today. But they're not . . . What would we say to a United States district court judge who's assessing a finding or a determination made in the New York State Supreme Court about these factors? I'm sorry, what would this court say to the district judge? What do we say? How do you discern? Essentially, it seems to me you're asking us to discern the credibility of the prosecutor in the reasons given. Judge, I don't think that that's the sole thing that I'm citing to. And if I could, this court sits in de novo review. So even if Judge Hellerstein had it wrong and he ended up using the clearly erroneous standard, which I think he was saying not as a legal concept because he had spotted or he had identified that unreasonableness was the standard that he had to meet, he was saying that ultimately the judge, particularly Ms. Caliste, never went beyond the hissing sound to go past the credibility of the prosecutor to determine whether indeed there was discrimination afoot, particularly when he heard three of four explanations started out with, I think these people somehow are inferior in their intellectual capability to serve on my jury. The appellate division unanimously rejected that position. So it's not just the trial judge in the state system. You had a unanimous rejection by the appellate division as well, correct? That's correct, Judge Kuntz. And the court of appeals declined to grant permission to appeal. And that's also correct. I can't speak to the procedural aspect except to say, going back to the question I was asked earlier, if one of many explanations meets the race-neutral criteria, then we can disregard the others and go ahead and accept that. That's really what had happened here, I think, particularly with Ms. Caliste. He heard the hissing. That's good enough, even though there is no other race-neutral. The judge at trial did not apparently hear any hissing and was concerned about that because if he didn't, if that did not happen, then that would bear very strongly against the credibility of what the prosecutor was saying. Then the judge made an inquiry to find out. And apparently, at least the way the judge saw it, the witness indicated that she may have been wheezing because she had a cold. So the judge then determined apparently that the prosecutor had heard something. And the judge, at least, who was there and watching what went on, was apparently not that concerned about how the prosecutor interpreted it, maybe because the judge thought the prosecutor was by and large telling the truth, but if the thing hadn't happened, that would have changed the judge's evaluation. Now, this is all kind of speculation about what the judge is doing, but I'm having a little trouble with the premise that what a federal judge is supposed to do is to put himself into the place of the state trial judge without having seen any of this and say, well, I think this other question should have been asked. But, Your Honor, with that, I think you can't isolate the hissing sound from the explanation given of what the hissing sound meant to the prosecutor. Yeah, but the judge thought that that was good faith, whether it was what the judge thought it was or whether that was what it actually was or what the witness said or the juror said it was. The judge believed that that's what the prosecutor thought, and the one thing the judge was concerned about was was the whole thing made up, and it turned out that on inquiry it wasn't. But respectfully, Judge, the issue was the hissing led him, the prosecutor, to believe that there was an internal monologue like there's mental illness, which the trial judge said absolutely not. She was handing the microphone. So immediately the concern is minimized, if not eliminated, that there should be some other explanation given for why this particular juror was stricken. So what you're saying is that the role of the federal judge is actually to fly spec not the judge's degree of inquiry into each of these various objections. I don't know that that's the judge. I'm sorry, Your Honor. I don't think that's the sole role of the district judge. The role of the district judge in this court sitting de novo is to overcome an extreme malfunction of the criminal justice system, which I think we had happen here today, that we're discussing here. Can I ask one simple question? You only have to win on one of these people, right? That's correct. In other words, we've got four different examples, each of which have different facts. They may bear on each other to the extent they may create a collective impression, but at the end of the day, if in three of these cases we're satisfied that the trial judge's decision was at least reasonable, but one of them not, you still win. That's correct, Judge. I think going back to what Judge Kunst had asked, ultimately I think Williams is a very strong comparative evidence situation. Look, here are 20-year-old kids who are all in college. I don't know what your life experience was, but at 21 you only have so much life experience you can bring to the table. In a case that I would say she's equally similarly situated to each of them, though she's African-American seems to be the only difference. But more importantly, this is not a very complicated case because not only is it two co-conspirators testifying against Mr. Johnson, there was an eight hours' worth of statements that Mr. Johnson gave implicating himself in the crime that were coming out through the chief witnesses. So all it was was a matter of credibility to be determined. It had legally complex issues with it that had been determined in terms of suppression and everything else. So I just don't think that the justifications fly. And with that, I see my time is up. But I thank you all for the opportunity to speak here today. Thank you, Mr. Holland. Ms. Wiseman. Ms. Wiseman, before you begin, you agreed, do you not, that you have to prevail with respect to all four, that all four of these determinations have to have been at least reasonable by the delegate? Absolutely, Your Honor, yes. First of all, just in response to Judge Kuntz's question, as my colleague said, at the time of regarding were there other African-Americans on the jury, we know of at least two who were actually on the jury at the time that this Vatson colloquy began. We don't know, because there is no record of it, whether any of the subsequent jurors selected were African-American. Your Honor, obviously, you're well aware of what the legal standard is here. The question is, was it unreasonable, beyond the point where reasonable minds might differ, for the trial judge, who was, again, I think we all know, was in the best position that anyone will be to make a determination about the credibility of the state prosecutor, whether his decision was unreasonable. It's clear the trial judge knew what he had to do and took that seriously. In the one case where the prosecutor was making a demeanor-based argument and the trial judge, as you pointed out, Judge Lynch, when the trial judge hadn't personally seen it, he actually called in the witness, questioned her, ascertained that there was something going on that could legitimately have been interpreted by the prosecutor as hissing. I also note that when the prosecutor was explaining his challenge, he said, you know, I wrote it down in my notes, hissing. And I think that's not something that you would do if you hadn't actually written it down, because, you know, for all you know, this judge, who is an inquisitive type of judge, could ask to see your notes. So, you know, based on that, he's making the determination about the prosecutor's demeanor and credibility and about whether what he saw from Ms. Caliste could be interpreted that way. And he obviously found, you know, his explanation, you know, maybe a little inartfully worded, but that is the nature of any extemporaneous speaking, including this speaking here. But it's very clear what he meant. He said to the defense, the issue isn't whether she was actually hissing or talking to somebody. The issue is, was there something here that the prosecutor perceived and correctly or incorrectly believed that was going on? And if the prosecutor believed that was going on, it doesn't matter if he was right or wrong, because that's a race-neutral reason, and he genuinely believed it. And that is always the issue. Was the prosecutor, did the race-neutral reasons he gave, were they his real reasons or were they pretexts for racial discrimination? And I think in all of these, with respect to all four of these jurors, again, in selecting a jury, you know, if the prosecutor has to get all 12, he doesn't want a hung jury, so the defense sort of wins if they get one juror on their side. So the prosecutor always has to be careful and err on the side of caution. I think everybody does in jury selection, because you can't sit down and, you know, examine everybody at great length. So you have to be careful. You see somebody who's making some noises, you don't know what they mean, well, let's not put that person on the jury, because there are many bad things it could mean. You see somebody who, you know, works with people who are like your witnesses, who might be involved in that milieu, well, you don't know how she'll react, so let's not put her on the jury. I think. May I just focus you on one thing and then we'll let you sit down? Back to Ms. Williams and sort of juxtaposing her with and her lack of life experience, which I think was the explanation given, with Mr. Wong and Mr. Berland, who were both relatively young and didn't seem to have much life experience. How do we, assuming we're the trial, well, as your colleague has pointed out, we have the ability here to reassess the evidence in the same way. Tell me why we should determine that that was a, whether we agree with it or not, that that was a reasonable view of the facts that the trial judge arrived at, and then ultimately, I guess, not ultimately, yes, ultimately the appellate division. Well, you know, as I previously stated, I think this is, I think it is, to me at least, I think it is perfectly reasonable to have a jury selection rationale that says, I don't want young people without life experience on the jury. Now, I should note that these two, there were two prospective jurors who the people did not challenge at the end, Mr. Wong and Mr. Berland. They were both, they did have some employment, which Ms. Williams did not have, and that's contrary to the, what the district court found, which I think was just based on a misreading of the record, as we explained in our brief. They also, those two jurors were not satisfactory to the defense. The defense did strike them. So it's not, you know, these are not necessarily challenging jurors for this reason. You know, you can have priorities, let's say, in jury selection. You don't want a jury that has somebody who is too young and doesn't have life experience. Just in general, it's not a good idea, whether for the reasons Judge Lynch stated or for the, you know, and having once been selected on a jury myself when I was just out of college, I have never allowed anyone of that age to be on a jury that I selected. So. Useful indiscretions can be a problem. Yes, Your Honor. So that being the case, I think it's a rational concern. It's not the greatest concern. You might have a greater concern about people who are, you know, who are living with convicted murderers, you know, who killed drug dealers. You might have a greater concern about somebody who appears to you to have some mental issues. So when you're at a different stage in the jury selection, and when you are facing the prospect of a whole new unknown veneer showing up that might be very bad and you would have very few challenges, it makes sense to put your priorities differently. If there are no further questions, we ask you to reverse the decision. Thank you. Thank you. Thank you both. Helpful arguments. We'll reserve decision in this case.